UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO.: 4:95 CV 25 |
| | ) | |
| PLAINTIFF | ) | JUDGE SOLOMON OLIVER, JR. |
| | ) | |
| V. | ) | |
| | ) | |
| ALAN MAURICE SMITH, | ) | |
| | ) | FINDINGS OF FACT AND |
| DEFENDANT | ) | CONCLUSIONS OF LAW |

The following shall constitute this court's findings of fact and conclusions of law under Federal Rule of Civil Procedure 52, following trial to the court, which was concluded on February 3, 1997.

I.   FINDINGS OF FACT

1.   Martin Ruddock, M.D., ("Dr. Ruddock") testified at trial concerning his experiences with Alan Maurice Smith ("Smith") while Dr. Ruddock was medical director at the Mahoning Women's Center (the "Center") and thereafter.

2.   Lynn Harmicar ("Harmicar") also testified at trial concerning her experiences with Smith prior to June 1994 when she was working at the Center.

3. Dr. Ruddock's and Harmicar's testimony demonstrated that beginning around the late 1980s, Smith began a course of conduct with the view of intimidating Mahoning County reproductive health providers from providing services, including abortion-related services.

4. Dr. Ruddock worked at the Center, providing abortion-related services, from 1979 to 1992.

5. Beginning in 1989, Smith began demonstrating at the Center. From the outset, Smith distinguished himself from the other anti-abortion demonstrators by protesting more vociferously than others and screaming and yelling at staff and clients entering and leaving the Center.

6. Once in 1991, as Harmicar was standing in front of the Center by herself, Smith came across Market Street, where he had been demonstrating, and pushed Harmicar.

7. Although initially directing his demonstration activities at the Center, Smith gradually began to shift his focus to Dr. Ruddock, yelling "babykiller" at the doctor and becoming particularly agitated whenever he saw the doctor.

8. On October 26, 1991, as Dr. Ruddock left the Center, Smith, who had been demonstrating at the Center, followed him in a silver Toyota truck. At the time, Dr. Ruddock did not know Smith's name but recognized him from Smith's activities at the Center. Dr. Ruddock drove onto I-680 and tried to get away from Smith, who pursued Dr. Ruddock at a high speed. Smith attempted to run Dr. Ruddock off the road, took pictures of him and flashed

- 2 -

a shiny metal object which Dr. Ruddock believed to be a gun. Smith, unable to overtake Dr. Ruddock, exited I-680 after following the doctor for approximately 12 miles. Dr. Ruddock immediately reported the incident to the Youngstown Police, identifying the license plate number of the Toyota truck. Smith was identified as the owner of the truck and Dr. Ruddock signed two complaints against Smith charging him with aggravated menacing and disorderly conduct. Smith was arrested by the Youngstown Police on December 9, 1991.

9. Smith admits that he had an encounter with Dr. Ruddock, on October 26, 1991, but claims that it was Dr. Ruddock who was the pursuer and that the doctor cut in front of Smith's vehicle trying to cause Smith to rear-end the doctor's car. Although Smith claims that he did not know who Dr. Ruddock was at the time, Smith testified that he took photographs of the doctor's vehicle before anything occurred between them. Smith did not retain these photographs. Smith did not report the incident. Smith's account of this incident is not credible.

10. The telephone number and address of Dr. Ruddock's 32-acre residence on Aquilla Road in Claridon Township, Geauga County, Ohio, is not published.

11. On November 8, 1991, while Dr. Ruddock was not at home, Smith went to Dr. Ruddock's neighborhood and asked neighbors where he lived. Smith was arrested on the scene by the Geauga County Sheriff's Department for trespassing on private property near the Ruddock residence. Among the items found in Smith's

- 3 -

truck when he was arrested was an Ohio Edison letterhead paper on which were written Dr. Ruddock's address and the notation "unpublished." Smith acknowledged that, as an Ohio Edison employee, he had access to customer addresses. Dr. Ruddock was informed of the incident by the Sheriff's Department and that Smith had been told to stay out of the area. Smith pled "no contest" to disorderly conduct in connection with this incident.

12. Shortly thereafter, a couple of weeks after the first chase, Dr. Ruddock again was pursued by Smith as the doctor left the Center. The doctor was heading toward Kent, Ohio to pick up his girlfriend and then attend a Cavaliers' basketball game near Akron, Ohio. Dr. Ruddock again drove at a high speed, between 90 and 100 mph on I-680, attempting to get away from Smith. The doctor eventually lost Smith, at a location approximately 42 miles from the doctor's home. When the doctor returned home late that night, he found a note in his mailbox on which was written words to the effect of: "You should not be driving at such a high speed. You lost me this time, but you better watch yourself." Dr. Ruddock turned the note over to the Geauga County Sheriff's Department.

13. Smith denies that the second chase took place. Dr. Ruddock's testimony is credible; Smith's testimony is not, in light of the entire pattern of conduct and events involving Smith and Dr. Ruddock.

14. On May 11, 1992, Dr. Ruddock heard a voice from his woods yelling, "Babykiller, babykiller!" He investigated and

- 4 -

found Smith on his property. Smith tried to escape and Ruddock chased him in his car, alerting his wife to call the Sheriff's Department. Dr. Ruddock ultimately apprehended Smith. A deputy sheriff arrived at the scene of the altercation and told Smith to stay away from Dr. Ruddock's residence.

15. Smith does not deny his presence near the Ruddock residence, that Ruddock chased and stopped him, or the involvement of the Geauga County Sheriff's Department. Smith, however, claims that he simply was driving by the Ruddock residence when the doctor began chasing him. Smith provided no explanation why he would be driving by the doctor's home. Given that Smith lives near Niles, Ohio, Smith's account of this incident is not credible.

16. Ruddock ceased his association with the Youngstown Mahoning Women's Center in 1992. He currently provides reproductive health services at the Center for Choice II in Toledo, as well as clinics in Akron and Cleveland.

17. On April 1, 1994, Smith participated in a demonstration at Center for Choice II in Toledo, Ohio. As Dr. Ruddock drove in, Smith, alone, approached his car and stated "I'm going to kill you!" Smith then returned to the group of demonstrators in front of the clinic. Dr. Ruddock gathered his personal effects and began walking to the clinic entrance, where the demonstration was taking place. Smith yelled to Dr. Ruddock that he would drive him out of Toledo, that he had driven him out of Youngstown and that he was going to pay Dr. Ruddock and his wife a visit.

18. At trial, Dr. Ruddock drew a diagram to show where this incident took place. This drawing was marked as Plaintiff's Exhibit 20 and admitted into evidence without objection from defendant. The location identified as "AS1" on Exhibit 20 is where Smith told Dr. Ruddock that he was going to kill him. "AS2" on Exhibit 20 is the location where Smith went when he rejoined the other demonstrators. The location identified as "verbal exchange" is where Smith told Dr. Ruddock that he had run him out of Toledo and would run him out of Youngstown.

19. Smith admits that he said he had driven Dr. Ruddock out of Youngstown and that pro-lifers would drive him out of Toledo.

20. The portions of the exchange between Smith and Dr. Ruddock, about running the doctor out of Youngstown and Smith's promised visit to the Ruddock residence, were filmed by another demonstrator. This videotape, which was marked as Plaintiff's Exhibit 32 and admitted into evidence without objection from defendant, confirmed that such an exchange took place.

21. Smith's comments on April 1, 1994, in conjunction with his prior conduct toward Dr. Ruddock, established that Smith's intent was to prevent Dr. Ruddock from providing reproductive health services in Youngstown, and that the means he used to accomplish this goal were harassing the doctor and his family at their home, verbally threatening the doctor, and chasing and attempting to harm the doctor with his truck.

- 6 -

22. Gerald Applegate, M.D., ("Dr. Applegate") replaced Dr. Ruddock in the fall of 1993 as medical director of the Mahoning Women's Center.

23. Dr. Applegate has performed abortions since 1984.

24. Prior to his arrival at the Center, Dr. Applegate had never been personally threatened or harassed for providing abortion services.

25. Dr. Applegate has never met or spoken to Dr. Ruddock.

26. Nobody at the Center told Dr. Applegate of Dr. Ruddock's encounters with Smith before he started working there. The Center's administrative staff had discussed whether to tell Dr. Applegate about Dr. Ruddock's experiences with Smith, but decided not to inform him, hoping that Smith's conduct toward Dr. Ruddock reflected a purely personal animosity toward the doctor.

27. Shortly after starting work at the Center, Dr. Applegate and his family began receiving anonymous letters at their home in Wexford, Pennsylvania. These letters referenced the fact that the doctor was providing abortion services, and many of them contained death threats against the doctor. Members of his family received birthday cards on their birthdays "From Your Pro-Life Friends." Dr. Applegate was particularly disturbed by a pro-life card that his son's daycare center received. This card not only identified his four-year-old son by name, but listed the number of his classroom and names of his daycare teachers. Another card listed the doctor's five children by name

- 7 -

with each name correctly spelled, despite the unusual spellings of the children's names. The family also began receiving a steady stream of anonymous, harassing telephone calls. In March and April 1994, Dr. Applegate's car tires were slashed and the lug nuts securing his tires were loosened while he was at the Center. In April, the family dog was killed. These anonymous acts made Dr. Applegate and his family fearful.

28. Dr. Applegate first encountered Smith in the winter of 1993/1994, when Smith came toward him in the parking lot behind the Center, yelling: "Babykiller, babykiller! Come here, babykiller! Come here, babykiller!"

29. Smith admits that the incident occurred but does not remember what he said to Dr. Applegate.

30. In the spring of 1994 and prior to June 18, Smith followed Dr. Applegate three times as he left the Center. Dr. Applegate observed Smith writing down the doctor's license number during these incidents. Twice Smith followed the doctor all the way to I-680. The doctor's usual route home was south on I-680 to the Ohio Turnpike and then the Pennsylvania Turnpike.

31. In the spring of 1994, Dr. Applegate advised Center administration of his growing concern about the anonymous communications received at his home, the incidents involving his car tires, and being followed by Smith. Center personnel decided that someone should escort Dr. Applegate when he left the Center, whenever possible.

- 8 -

32. Harmicar escorted the doctor several times in the spring of 1994. On one occasion, as she was following Dr. Applegate, Harmicar observed Smith alongside her car. Smith expressed surprise at seeing Harmicar next to him and immediately dropped back. Harmicar later informed Dr. Applegate of this incident.

33. From early June through November 1994, Dr. Applegate and his family experienced four incidents involving Smith, which incidents are four of the five alleged violations of the Freedom of Access to Clinic Entrances Act ("Access Act"), 18 U.S.C. § 248 (1994), at issue in this action.

34. Roberta G. Antoniotti ("Antoniotti"), Director of Planned Parenthood of Mahoning Valley, had an encounter in September 1994 with Smith, which also is an alleged violation of the Access Act. The findings with respect to each incident are set forth below.

35. Dr. Applegate's wife, Karen Applegate ("Mrs. Applegate"), testified at trial through her deposition about an incident on June 6, 1994, when Smith and other anti-abortion demonstrators prevented her from leaving her car outside her husband's office, located at that time on the grounds of Passavant Hospital in Allyson Park, Pennsylvania (the "Passavant office").

36. In June 1994, Mrs. Applegate was working as the office manager in her husband's Passavant office.

- 9 -

37. On the day of the incident, Mrs. Applegate arrived at the office between 12:00 noon and 1:00 p.m., in the midst of a pro-life demonstration that had been taking place since 10:00 a.m.

38. As Mrs. Applegate drove into the Passavant office parking lot in her white Toyota MR2, she observed a demonstration taking place. Smith, whom she recognized from demonstrations at the Applegate's home, upon seeing Mrs. Applegate, started screaming and shouting words to the effect of: "There she is! That's his wife!" A number of the demonstrators, led by Smith, approached her car, five or six walking up to the driver's side door. Smith circled her vehicle. Mrs. Applegate could not leave her car. She was terrified; she was "scared to death" of Smith. Mrs. Applegate also saw a female protester in a van circling her vehicle. She called her husband on her car phone to alert him to her predicament and to get someone to come outside to escort her into the building. She also called security and the police. Jack Martin ("Martin"), a WTAE television reporter who had been interviewing the demonstrators, eventually escorted Mrs. Applegate into the Passavant office. Mrs. Applegate's account is credible and corroborated by several other witnesses.

39. Dr. Applegate was in his Passavant office at lunchtime when Mrs. Applegate called and said she was surrounded in the parking lot by demonstrators, including Smith who was circling her car. Nancy Tilton and a policewoman were in his office at the time. Mrs. Applegate was frantic. She called him

- 10 -

approximately ten times over a half-hour period. Dr. Applegate tried unsuccessfully to get security and the police to go to Mrs. Applegate's aid. Finally, she was escorted into the Passavant Clinic by Martin. When she arrived in his office, she was more shaken up than the doctor had ever seen her.

40. Nancy Tilton ("Tilton"), a patient escort at the Passavant office, testified at trial about what happened that day. She had observed the demonstration since it began in the morning. She was in Dr. Applegate's office when he received a call from Mrs. Applegate, which he put on his speaker phone. Tilton heard Mrs. Applegate say that she was afraid to get out of her car and wanted police assistance. Tilton and fellow patient escort Emily Murphy went to the door of the building in which the doctor's office was located and observed the scene outside. Tilton observed some demonstrators picketing on the sidewalk outside while others walked up to and near Mrs. Applegate's car. Three demonstrators including Smith, who appeared to be the leader of the group, approached within a foot of Mrs. Applegate's car; others were as far away as twelve feet. At one point, Tilton observed Smith walk up to Mrs. Applegate's door, within a foot, bend down to be at eye level with her, and peer over his large sign at her. A picture taken at the demonstration by Murphy (Plaintiff's Exhibit 14D) shows Smith carrying a sign that read, "Applegate is a babykiller and a deadbeat dad." Smith remained at Mrs. Applegate's door briefly. In Tilton's opinion, Mrs. Applegate could not have opened the driver's door at that

point in time.  As Smith walked away from Mrs. Applegate's car he had an expression of self-satisfaction on his face.  Tilton observed a woman in a blue vehicle circling Mrs. Applegate's car. A television cameraman and anchorman escorted Mrs. Applegate into the building.  Upon arriving at her husband's office, Mrs. Applegate appeared white, frightened and shaky.  Tilton testified that had she been in Mrs. Applegate's position, she would have been afraid.

41.  Martin, at the time an anchorman for a Pittsburgh television station, was at the Passavant office for part of the demonstration to report on the anti-abortion demonstration. Almost immediately after arriving at the hospital, Martin interviewed a group of demonstrators.  While interviewing the demonstrators, Martin was paged by his news editor, who told him that Mrs. Applegate was in the hospital parking lot and would take Martin to interview her husband.  Martin discreetly went over to Mrs. Applegate's car and spoke to her.  Mrs. Applegate appeared anxious and emotional to Martin.  She described to him actions taken by pro-life demonstrators that had made her fearful.  While Martin was talking to Mrs. Applegate, with his cameraman close by, one of the female demonstrators circled them several times in a blue vehicle, taking Mrs. Applegate's and Martin's picture as she circled.  Martin found this conduct intimidating and went back to the sidewalk demonstrators and voiced his displeasure concerning this treatment.  Martin described the demonstrators' response as confrontational.  Martin

- 12 -

returned to Mrs. Applegate's car, and Mrs. Applegate asked Martin to accompany her into the Passavant office, assuring him that he could interview her husband. Martin, who had covered a number of abortion protests, found this one different; he was concerned about the emotional climate. As he accompanied Mrs. Applegate to the Passavant Clinic entrance, more than one demonstrator made challenging, possibly contentious, comments. Prior to being paged by his news editor, Martin had not noticed or observed Mrs. Applegate's car or any activity in the parking lot; Martin did not even know who Mrs. Applegate was. When Martin eventually went over to her car, Mrs. Applegate indicated to Martin that she had been in the parking lot for some time, that she had observed him interviewing the protesters and that she had called the news station so that he would come over to her car. Martin, a neutral observer, is credible, and his compelling account is consistent with that of Mrs. Applegate and Tilton.

42. Smith presented three witnesses, Kathy Hall ("Hall"), Jean Balcerzak ("Balcerzak") and Ann Francis ("Francis"), regarding this incident. All three witnesses testified that the incident involving Mrs. Applegate never occurred and that, in fact, on that day, Mrs. Applegate sped out of the parking lot after talking to Martin. All three witnesses denied that Martin ever accompanied Mrs. Applegate into the Passavant office. On January 11, 1997, all three witnesses participated in a trial preparation meeting with the defendant and two of his attorneys,

- 13 -

in which these witnesses discussed in a group their expected trial testimony.

43. Martin's testimony completely discredits the testimony of Hall, Balcerzak and Francis. The only reasonable conclusion to draw from the conflict in testimony is that these three witnesses' recollections were unduly influenced by the January 11th meeting. Their "collective" testimony, a product of their January 11th discussions rather than first-hand knowledge of the events of June 7, 1994, is of no probative value. Furthermore, Hall and Balcerzak, by their own accounts, were demonstrating elsewhere on the Passavant Hospital grounds until immediately before Martin approached Mrs. Applegate's vehicle. Ann Francis' testimony further lacks credibility because of major discrepancies between hers and others' accounts with respect to other incidents described below.

44. There is no dispute among the United States' or defendant's witnesses that a demonstration occurred in June 1994 during which both Mrs. Applegate and Martin arrived. Based on the testimony of all witnesses, the demonstration is most likely to have occurred on June 7, 1997.

45. There is substantial evidence that the events on this day occurred as described by Mrs. Applegate and Tilton and as corroborated by Dr. Applegate and Martin.

- 14 -

46. On June 16, 1994, Smith pantomimed the act of firing a gun at Dr. Applegate while demonstrating outside Dr. Applegate's home.

47. Dr. Applegate testified credibly regarding the events on that date. On June 16, 1994, Smith was participating in a demonstration outside Dr. Applegate's home. Smith's conduct that day was similar to his conduct at a demonstration on April 24, 1994 at the Applegate's home, when Smith walked up and down the street, stopped cars, waved his arms and yelled: "There's an abortionist living here! There's a babykiller in your neighborhood!" Dr. Applegate remembered the June 16th demonstration well, as that day was his and his twin brother Steven's birthday, which they celebrated together. April 24th was his wife's birthday. Demonstrators picketed at the Applegates' home on family members' birthdays. During the June 16, 1994 demonstration, Dr. Applegate left his house by car with his wife, stepdaughter Bobbi and son Evan. His brother was in a separate car. Smith was standing on the southwest corner of Grubbs Road and Rustin Way. As the Applegates' car approached the intersection, Smith pointed his finger at Dr. Applegate as if to cock a gun, squeeze the trigger and fire at him. Dr. Applegate testified Smith was smirking and smiling as if to say "I know where you live and I could just take you out anytime I want to." At that moment, Dr. Applegate felt that Smith was threatening him. Dr. Applegate's feeling was based on his prior

- 15 -

encounters with Smith and other threatening conduct and communications that had been directed at him and his family by anti-abortion advocates.

48. Dr. Applegate was positive the date of this incident was June 16th rather than April 24th. Acknowledging that he had testified during a deposition taken in a civil RICO case that the date of this incident was April 24th, he explained that there were so many dates mentioned during that deposition that he had become confused. The civil RICO complaint correctly identified June 16th as the date of the pantomiming incident.

49. Mrs. Applegate's testimony corroborated her husband's testimony with respect to the important facts: as she, her husband and their children were leaving their home in the car, Smith, who was standing on the southwest corner of Grubbs Road and Rustin Way, pantomimed the act of firing a gun at her husband.

50. Smith presented two of the same witnesses who testified about the June 7, 1994 incident -- Balcerzak and Francis. These two witnesses testified that nothing happened on June 16, as the Applegates were not at home. Aside from the fact that these witnesses prepared their testimony about this incident at the January 11, 1997 meeting, their account is inconsistent with Francis' deposition testimony in this case in which she said that not only were the Applegates home on June 16, 1994, but they came outside at some point during the demonstration, got in their car, and sped away from the house. Furthermore, the knowledge and/or

- 16 -

credibility of these two witnesses, as well as Smith's other witnesses, regarding Smith's conduct at any demonstration is dubious in light of their refusal to even acknowledge that Smith routinely yells at the doctor -- a fact freely admitted by Smith.

51. Smith and Francis testified that, instead of Smith pantomiming the act of shooting Dr. Applegate, it was actually Dr. and Mrs. Applegate who pantomimed the act of shooting Smith on May 15, 1994. This contention is not credible. Smith never mentioned this alleged pantomiming during his deposition, despite having been questioned exhaustively about any conduct by the alleged victims in this case that he considered illegal, harassing or intimidating. Although Smith routinely noted the receipt of anonymous pro-choice correspondence in his 1994 pocket calendar, he made no notation of the claimed pantomiming incident on May 15, 1994. Francis did not testify about this incident during her deposition either. Smith was unsure if Francis was even present when the alleged pantomiming took place. Furthermore, Francis' overall credibility is highly questionable, given, as previously discussed, the discredited testimony she gave concerning the June 7, 1994 allegation and her inconsistent testimony concerning the June 16, 1994 allegation, and, as will be discussed, her testimony concerning the November 13, 1994 allegation, which was ultimately discredited by Smith's own witness.

- 17 -

52. Dr. Applegate credibly and compellingly testified that, on June 18, 1994, Smith followed the doctor as he left the Center, chased the doctor's car and attempted to force the doctor into oncoming traffic with his truck. This incident was the subject of a criminal case against Smith in Youngstown Municipal Court, in which Dr. Applegate was the complainant. On February 3, 1995, a jury in Youngstown Municipal Court found Smith guilty of menacing by stalking. Cross-examination of Dr. Applegate in this case did not reveal any inconsistencies between his testimony in this Court and the criminal trial.

53. As Dr. Applegate drove out of the Center on Saturday afternoon, June 18, in the company of his brother, he observed Smith run to get in his truck parked across the street from the Center. Smith had been demonstrating in front of the Center, which is located on Market Street, a major thoroughfare in Youngstown. Dr. Applegate turned right out of the Center's driveway, headed north on Market Street and turned right onto Midlothian Boulevard. Because Smith had followed the doctor several times before, Dr. Applegate decided to turn right off Market Street onto Howard, a side street not on the doctor's normal route home, in an effort to hide from Smith. The doctor intended to allow Smith enough time to leave the immediate vicinity. However, Smith drove up behind Dr. Applegate. Seeing Smith, Dr. Applegate took off down Howard, turned right onto Wilma and headed back to Market Street. The doctor turned right

- 18 -

again at Market, with Smith in pursuit. As the two men drove north on Market again, Smith pulled up on the doctor's right side and yelled words to the effect of: "Babykiller! Applegate, you're dead. Where's your wife? I'm going to kill you!" Smith then drove his truck toward Dr. Applegate's car, forcing him further and further to the left and almost into oncoming traffic. As the two vehicles reached Midlothian Boulevard, the doctor slowed down and Smith sailed through the intersection. Making an illegal move, Dr. Applegate cut his vehicle behind Smith's passing truck, to the right across the intersection and into a BP station on northeast corner of the intersection. At the gas station, Dr. Applegate called the Youngstown police, who arrived about a half hour later and wrote up a report. Smith was arrested on June 26, 1994 and charged with felonious assault and menacing by stalking, in violation of Ohio Revised Code §§ 2903.11(A)(2) and 2903.211(A), respectively.

54. Asserting a position similar to that taken with respect to the October 26, 1991 Dr. Ruddock chase, Smith claimed that it was actually Dr. Applegate who chased him and the not the other way around. Smith's account is neither plausible nor credible. Smith did not report the incident to the police. Following Smith's arrest on June 29, 1994, he was interviewed by a local television reporter and made no claim that Dr. Applegate chased him. Rather, he stated in the televised interview:

> If Gerald Applegate thinks this is going to
> stop me from doing what I've been doing, and
> that's revealing the truth about what he
> does, as a babykiller and deadbeat dad, he's

- 19 -

> sadly mistaken. [Question: You do realize
> abortion is legal?] I don't care if it's
> legal. It's still child killing. I'm going
> to continue to reveal the truth about what he
> does. This isn't going to deter me in any
> way.

During a January 7, 1995 interview by Katie Couric on the Today
Show, Smith was also asked to respond to the allegation in the
complaint relating to the June 18 altercation with Dr. Applegate.
Smith simply denied the allegation, rather than explaining what
he claims happened. Finally, Smith's calendar entry for June 18,
1994 makes no reference to this alleged incident. Rather, it
indicates only the following information: "Kills" [by
Applegate], that the doctor arrived in an "MR2 from the north at
10:15," "left at 4:30" and that "Steve Applegate was with him."

55. Although two of Smith's witnesses, Robert Raco ("Raco")
and Francis, testified that Smith called and told them about this
incident, their testimony is undercut by Smith's own testimony.
Both Raco and Francis testified that Smith called them the
evening of the incident. Although Smith claimed at trial not to
remember when he contacted Raco or Francis, at his deposition in
October 1995, Smith testified that he did not talk to Raco about
the incident until a week or two afterwards. Smith made no
mention during his deposition of any conversation with Francis.
Furthermore, even if Smith had contacted Raco or Francis, neither
of these individuals has any firsthand knowledge of what occurred
between Dr. Applegate and Smith.

56. Antoniotti, who has been the Executive Director of Planned Parenthood of Mahoning Valley since 1991, testified at trial about Smith's and other demonstrators' activities outside Planned Parenthood's Youngstown facility, where her office is located. Planned Parenthood of Mahoning Valley does not offer abortion services. Antoniotti has never met either Drs. Ruddock or Applegate. Smith has demonstrated outside Planned Parenthood in Youngstown twelve to fourteen times from 1992 to 1994, has consistently used a video camera and has been more verbal than other demonstrators, yelling at her "babykiller" and maligning Planned Parenthood.

57. During Antoniotti's tenure at Planned Parenthood, she has received by mail at her home a death threat and shotgun shells. A fake bomb was mailed to Planned Parenthood, and the clinic has been vandalized on several occasions. The identity of the person or persons who did these acts has never been determined.

58. Antoniotti described two incidents involving Smith, one occurring on June 17, 1993 and the second on September 29, 1994. Her testimony is credible, persuasive and substantiated in part by subsequent actions taken by Smith.

59. On June 17, 1993, an evening demonstration took place at Planned Parenthood in Youngstown. Smith was there protesting and yelling such things as "babykiller" at Antoniotti, as well as verbally challenging Planned Parenthood's role in providing

- 21 -

reproductive health services. Antoniotti took photographs of the demonstration, as was her routine practice. Near the end of the demonstration, a contract cleaning woman was confronted by unidentified demonstrators, who told her that they were not going to let her out of the parking lot and that they were going to follow her. The demonstrators also confronted her about how she could accept "blood money" from Planned Parenthood. The cleaning woman, who was extremely scared by the demonstrators' comments, told Antoniotti about this encounter. Antoniotti called the police.

60. Later on that evening, at approximately 9:00 p.m., Antoniotti was working in her second floor office when a voice, which she recognized as Smith's, yelled up to her that he would be back to get her and that he would find out where she lived.

61. On September 29, 1994, Smith was demonstrating outside Planned Parenthood, camera in hand and carrying a sign proclaiming, "Planned Parenthood kills babies, too." Antoniotti took pictures of the demonstration. There was a group of neighborhood children playing outside. Smith and a fellow demonstrator approached the children and told them that Antoniotti was a witch and that Planned Parenthood killed black children. To defuse this situation, Antoniotti escorted the children inside and gave them a tour of the research and education center.

62. Later that day, Antoniotti was in the parking lot when Smith, alone and standing on the sidewalk nearby, stated "I'm

- 22 -

going to get you." Smith was about thirty feet from Antoniotti when he made this statement. Based on her experiences with Smith and the anonymous threats that have been directed at her and Planned Parenthood, Antoniotti felt threatened by Smith's conduct. As Antoniotti testified, she is not easily intimidated and, at the time of these incidents, believed that the First Amendment permitted anti-abortion demonstrators, like Smith, to say harassing and offensive comments to her.

63. Despite Antoniotti having an unlisted telephone number and nonpublished home address, Smith ascertained where she lives. Since entry of the preliminary injunction in this case, Smith has provided notice several times that demonstrations would take place at Antoniotti's residence. No demonstrations have taken place as noticed by Smith. Antoniotti, however, has seen Smith drive up and down her street in his truck since the issuance of the preliminary injunction in this case. On one occasion, a truck resembling Smith's truck pulled into and back out of her driveway late at night.

64. Although denying that he threatened Antoniotti on either date, Smith acknowledges his interactions with Antoniotti earlier on September 29, 1994 and his contact with the neighborhood children. Antoniotti's demeanor and testimony indicate that she is a credible witness. In a battle of credibility against Smith, Antoniotti wins.

65. Smith's intent to intimidate Antoniotti is evidenced not only by the June 17, 1993 and September 29, 1994 incidents,

- 23 -

but by a subsequent incident that Smith acknowledges occurred at Planned Parenthood.  At a demonstration at Planned Parenthood on June 22, 1996, Smith asked Lillian Williams, then Planned Parenthood's security officer, to tell Antoniotti that he was sorry he missed her and that "he would be back."  Furthermore, the September 29, 1994 incident fits in with Smith's "consistent pattern of conduct" -- indicative of his intent to intimidate reproductive health care providers -- where, as testified to by Drs. Ruddock and Applegate and Harmicar, Smith only acts when there are no witnesses around.

66.  Dr. Applegate's stepdaughter, Jaime Groetsch ("Groetsch"), testified at trial through her deposition that, during a demonstration at the Applegate residence on November 13, 1994, Smith threatened her stepfather.

67.  On this day, there was an anti-abortion demonstration at the Applegates' home.  During the demonstration, Groetsch came out of her home, accompanied by her boyfriend, in order to take pictures of Smith and other demonstrators.  Her mother allowed her to go outside, since the police were there.  She took Smith's photograph while he was standing on the northwest corner of Grubbs Road and Rustin Way.  Groetsch, accompanied by her boyfriend, approached within twenty feet of Smith, taking photographs.  Smith asked her if she was Applegate's daughter. Groetsch did not respond.  Smith began walking up the hill, north on Grubbs Road, to get in a car driven by a woman unknown to

- 24 -

Groetsch. While Groetsch tried to take photographs of the license plate, Smith turned to her and said "He's dead." Groetsch testified her boyfriend was following her but did not hear the comment. Smith, laughing smartly, sarcastically said he was going to call the police because she was stalking him. Smith acted as if he was calling the police on his cellular phone. Groetsch testified she turned around and went home, frightened about what Smith had said about her stepfather. Groetsch's testimony, corroborated by the excited utterances she made to her mother and stepfather, as well as by the testimony of defense witness Gladys Stayert, is credible.

68. Dr. and Mrs. Applegate both described Groetsch as upset upon her return to the house. They both indicated that Groetsch told them that Smith had asked if she was Applegate's daughter and had said words to the effect of, "He's dead."

69. Defense witness Gladys Stayert ("Stayert"), an elderly woman who was in the car that Groetsch testified about, testified that she did not hear Smith say to Groetsch, "He's dead." However, Stayert's account, which is entirely consistent and corroborative of Groetsch's testimony, leaves open a window of opportunity during which Smith could have made the threat without being heard by Stayert. Stayert did not get out of her car until after Smith, who had not yet gotten into Stayert's car, had already gone behind the car to prevent Groetsch from photographing Stayert's license plate. Although Stayert could not remember at trial whether her driver's side window was open

at that time, she acknowledged that she may have testified at her deposition a week earlier that her window was probably not open, otherwise, she would have yelled at Groetsch from inside the car. Moreover, Stayert's inability to hear questions propounded to her by government counsel from the podium at trial -- requiring government counsel to stand within a few feet of the witness stand during the cross-examination -- indicates that Stayert's hearing is not particularly acute. The words, "he's dead," take but a second to say.

70. Smith admits the pertinent events of November 13, 1994 as described by Groetsch, except denies telling Groetsch, "He's dead." Smith participated in the November 13th demonstration despite having been ordered by Youngstown Municipal Judge Levy not to go near Dr. Applegate and not to leave Ohio, except to attend Pittsburgh Pirates or Steelers games, during the pendency of the criminal case. Although Smith claimed at trial that Judge Kerrigan had lifted Judge Levy's prior restraint, at the time of the demonstration, Dr. Applegate clearly believed that Judge Levy's order was still in effect and that Smith was blatantly violating the order by coming to the doctor's home.

71. Francis testified at trial that during the November 13, 1994 demonstration she had followed Groetsch and Smith all the way up Grubbs Road to Stayert's car. Francis then placed herself in the middle of the incident involving Smith, Groetsch and Stayert. Francis' testimony, however, was completely discredited by Stayert, who testified that Francis was nowhere in sight at

the time of the incident near the car. Francis' testimony has no probative value with regard to this incident; rather, it serves only to conclusively destroy Francis' overall credibility. This incident rounds out the trio of incidents about which Francis gave testimony that either conflicted with the testimony of other more credible witnesses (e.g., Martin on the June 7, 1994 incident and Stayert on the November 13, 1994 incident), or was inconsistent with her own prior testimony (e.g., June 16, 1994 incident).

72. During cross-examination, Smith was questioned at length concerning his 1994 pocket calendar produced during the course of discovery with all personal data and attorney-client privilege material redacted by his attorneys.

73. Viewed in its entirety, this document reveals a picture of a man who was obsessed with the activities of Dr. Applegate and who recorded numerous details about the doctor's activities such as, "kills" and "no kills" (the dates the doctor performed or did not perform abortions), the make and model of the automobile the doctor drove to the Center each time, when the doctor arrived and departed, the direction from which the doctor arrived at the Center, and dates when Smith could not determine whether Applegate was at the Center. In its entirety, Smith's calendar is highly probative of Smith's intent, motive and plan to stop Dr. Applegate from performing abortions.

- 27 -

74. As to the specific dates of the incidents alleged in this case, Smith's calendar is revealing for what it does not contain. Although Smith recorded the dates he received anonymous pro-choice mail, the calendar is devoid of any reference to any claimed act of harassment or intimidation by Dr. Applegate, such as the May 15, 1994 pantomiming. Smith's notations for June 18, 1994 are similarly revealing. Smith noted that Applegate arrived at 10:15 a.m. in his MR2 from the north, performed abortions and departed at 4:30 p.m. and that Steve Applegate was with him. But no mention was made of the altercation with Dr. Applegate. If it had occurred as described by Smith, it is logical to assume Smith would have noted the event. The notations for the date indicate that Smith was watching Dr. Applegate and are corroborative of Dr. Applegate's testimony that Smith did in fact follow him and not the other way around.

75. Finally, the notation Smith made in his calendar on December 30, 1994 reveals that, at that time, he knew that he had committed acts that might violate the Access Act. On that date, Smith wrote in his calendar: "Check alleged dates of stalking", followed by a redaction on grounds of attorney-client privilege, then a question to himself "When did law take effect?" Smith's explanation at trial that he was referring to multiple stalking charges and the applicable Ohio Revised Code provisions governing the Youngstown Municipal Court criminal charges is unconvincing. As the attorney-client redactions indicate, Smith already had counsel in his criminal case at that time; indeed, the trial

- 28 -

occurred less than a month later. Surely, had the effective date of the criminal statutes been at issue, Smith's attorneys would have checked into it by then. Thus, there is no other logical interpretation of Smith's notations except that they demonstrate his knowledge, back in December 1994, that he had committed various acts that could subject him to prosecution or liability under the Access Act.

76. As Smith acknowledged, on February 3, 1995, following a jury verdict and conviction in Youngstown Municipal Court for menacing by stalking, he was ordered to stay away from the Center.

77. In spite of the Municipal Court order, Smith demonstrated at the Center on July 27, 1996. During the demonstration, he threatened Dr. Applegate as the doctor was walking into the Center. Based on this incident, this Court, on August 26, 1996, found Smith to be in criminal contempt of the preliminary injunction in this case.

78. Dr. Applegate testified at trial that, on December 14, 1996, he was enroute home from the Center on I-680 when Smith came up on his left side, cut in front of the doctor's automobile and applied his brakes so that Dr. Applegate had to lock his wheels to avoid a collision. Smith then waved at the doctor. Smith exited the interstate before the exit for the Ohio

- 29 -

Turnpike. Dr. Applegate called counsel for the United States, who filed a second motion to show cause why Smith should not be held in criminal contempt. Smith's uncorroborated testimony is that the incident never occurred and that he was home at the time of the incident.

79. On August 20, 1996, upon rendering a judgment of criminal contempt, this Court ordered Smith "not to protest anywhere near or in the vicinity of the Mahoning Women's Center" during the pendency of this case (August 26, 1996 Hearing, Tr. 18).

80. On January 19, 1997, in clear violation of the Court's August 26, 1996 order, Smith participated in a demonstration across the street from the Center. Smith even alerted Youngstown television stations that he would be there. During an interview by a local television station, Smith said that, although he was under a Youngstown Municipal Court order stay away from the Center, he did not think that Judge Kerrigan would mind because the judge had permitted Smith to participate in the same demonstration the previous year.

81. During Smith's January 19, 1997 interview, which was televised on the evening news of the local ABC affiliate, Smith also stated:

> They, the courts and the pro-death crowd,
> have tried their best to put roadblocks in my
> way. But I either go through the roadblocks
> or around them.

- 30 -

82. Smith testified that prior to participating in the January 19, 1997 demonstration, he had called John France, one of his attorneys in this case, and that France had told him that, under this Court's order, it was permissible for him to participate. Smith also testified that he did not remember the Court ordering him to stay away from the Center on August 26, 1996.

83. Smith's testimony conflicts with John France's representation to this Court at a sidebar discussion that, prior to the demonstration, Smith informed France that this Court had ordered him not to demonstrate near the Center.

84. All of the incidents occurring after the alleged Access Act violations are indicative of Smith's intent -- ironically summed up by Smith's January 19, 1997 televised "roadblock" statement -- to stop Mahoning County reproductive health providers from performing abortions without regard for the law or the orders of any court.

II. CONCLUSIONS OF LAW

1. The Court has jurisdiction over this action under the Freedom of Access to Clinic Entrances Act of 1994 (the "Access Act"), 18 U.S.C. § 248, and 28 U.S.C. § 1345.

2. The United States has standing to initiate this action pursuant to the Access Act, 18 U.S.C. § 248(c)(2).

- 31 -

3. Venue in the Northern District of Ohio is proper pursuant to 28 U.S.C. § 1391(a)(1). The only defendant in this action resides in this jurisdiction.

4. The Access Act, 18 U.S.C. § 248, provides, in pertinent part, as follows:

(a) PROHIBITED ACTIVITIES. -- Whoever --

(1) by force or threat of force or by physical obstruction, intentionally injures, intimidates or interferes with or attempts to injure, intimidate or interfere with any person because that person is or has been, or in order to intimidate such person or any other person or any class of persons from, obtaining or providing reproductive health services . . . shall be subject to . . . the civil remedies provided in subsection (c) . . . .

(c) CIVIL REMEDIES. --

. . . (2) ACTION BY ATTORNEY GENERAL OF THE UNITED STATES

. . . (B) RELIEF. -- In any action [brought by the Attorney General], the court may award appropriate relief, including temporary, preliminary or permanent injunctive relief
. . . .

5. As indicated above, the Act does not require proof that any client or patient was prevented from obtaining reproductive health services by the defendant's conduct.

6. As also indicated above, a threat violates the Act even if it is not directed at a reproductive health care provider so long as it was intended to intimidate "any other person or class of persons from obtaining or providing reproductive health services." On this point, the Act's legislative history is very clear:

Those entitled to sue as "aggrieved persons" would include, for example, patients, physicians or clinic

- 32 -

staff (or their families[)] subjected to violence,
threatened with harm, or physically blocked from
entering a clinic . . . . Persons injured in the course
of assisting patients or staff in gaining access to a
facility, or injured bystanders, may also sue if they
can establish that the conduct causing the injury was
undertaken with the requisite motive -- in order to
intimidate some person or class of persons from
obtaining or providing abortion-related services.

S. Rep. No. 117, 103d Cong., 1st Sess. 26 (1993) ["Senate
Report"].

7. As this Court has already held, the Access Act is constitutional. United States v. Smith,
No. 4:95 CV 0025 (N.D. Ohio Jan. 14, 1997) (order denying defendant's motion for judgment on
the pleadings). As the law of the case, the Court's decision governs this issue and no additional
ruling is necessary. See Hanover Ins. Co. v. Am. Engineering Co., 105 F.3d 306, 312 (6th Cir. 1997)
(law of the case doctrine precludes court from reconsidering identical issues; issues decided at earlier
stage of litigation constitute the law of the case) (citations omitted).

8. In enacting the statute, Congress acted within its Commerce Clause authority. Smith, No.
4:95 CV 025, slip op. at 3-7; Am. Life League v. Reno, 47 F.3d 642, 647 (4th Cir. 1995), cert den.
516 U.S. 809 (1995).

9. The Access Act does not violate the First Amendment -- it is not overbroad, does not chill
protected speech or expression, and does not involve unreasonable time, place, or manner
restrictions. Smith, slip. op. at 10; Am. Life League, 47 F.3d at 648-53.

10. The Access Act does not violate the Free Exercise Clause, because it is a neutral,
generally applicable law. Smith, slip. op. at 7-9; Am. Life League, 47 F.3d at 654.

11. True threats of force lie outside the scope of First Amendment protection. Id. at 648;
United States v. Dinwiddie, 76 F.3d 913, 925 (8th Cir. 1996), cert. den. 519 U.S. 1043 (1996).

- 33 -

12. A threat is a serious statement expressing an intention to inflict injury, which under the circumstances would cause apprehension in a reasonable person, as distinguished from idle or careless talk, exaggeration, or something said in a joking manner. See United States v. McMillan, 946 F. Supp. 1254, 1258 (S.D. Miss. 1995); United States v. Turner, 960 F.2d 461, 464 n.3 (5th Cir. 1992) (citing Fifth Circuit Pattern Jury Instructions).

13. A threat need not be one of imminent harm; a statement suggesting an intent to cause physical harm at some time in the future is sufficient to constitute a "threat" within the meaning of the Access Act. See Dinwiddie, 76 F.3d at 925.

14. Nor does a threat have to be made directly to the intended victim. See, e.g., United States v. McMillan, 946 F. Supp. 1254, 1258 (S.D. Miss. 1995) (court found statements made to contractor working on building intended as threat to clinic employees who may have overheard conversation); United States v. Vincent, 681 F.2d 462, 463-64 (6th Cir. 1982) (threats to kill President made to Secret Service agents constituted threats against President).

15. "An absence of explicitly threatening language does not preclude the finding of a threat." United States v. Malik, 16 F.3d 45, 49 (2d Cir. 1994), cert. den. 513 U.S. 968.

16. Whether a statement or conduct constitutes a threat under the statute is an objective analysis: the only question for the finder of fact is whether a reasonable person would apprehend a statement or conduct as expressing "a determination or intent to injure presently or in the future." See Dinwiddie, 76 F.3d at 924-25; United States v. Glover, 846 F.2d 339, 343 (6th Cir. 1988), cert. denied, 488 U.S. 982 (1988). It does not matter whether the defendant harbored an actual, subjective intent to carry out a threat. Glover, 846 F.2d at 343.

17. With respect to the "reasonable person" standard, the appropriate perspective in this case is that of a reasonable provider of reproductive health services. Thus, it is appropriate for the Court

to consider facts that affect the perspective of the reasonable reproductive health care provider. See, e.g., McMillan, 946 F. Supp. at 1268 (court found threat where defendant's statements intimidated "clinic staff already on edge because of the escalated violence nationwide against abortion clinics"); United States v. Hart, 212 F.3d 1067, 1072 (8th Cir. 2000) (holding that a reasonable jury could have concluded that parking Ryder trucks, which were associated with the Oklahoma City bombings, at the entrance of an abortion clinic constituted a "true threat" of force).

18.    An alleged threat must be analyzed "in light of [its] entire factual context.'" Dinwiddie, 76 F. 3d at 924 (quoting United States v. Lee, 6 F.3d 1297, 1306 (8th Cir. 1983). See McMillan, 1996 WL 673460 at *13 (in finding threats, court "reviewed circumstances and context of the speech involved"); Lucero v. Trosch, 928 F. Supp. 1124, 1129 (S.D. Ala. 1996) (court considered context in which defendant made alleged threat in private Access Act lawsuit).

19.    The court in Dinwiddie, 885 F. Supp. 1286, in analyzing whether the defendant had made threats, considered a myriad of facts, including ones that "1) transpired prior to the enactment of [the Access Act]; or 2) [ones] not linked directly to Dinwiddie." Id. at 1291.  These facts included the reaction of the recipient and other listeners, whether the alleged threat was conditional, whether it was communicated directly to its victim, whether the maker had made similar statements to or engaged in similar conduct with respect to the victim in the past and whether the victim had reason to believe the maker had a

propensity to engage in violence. Dinwiddie, 76 F.3d at 925 (emphasis added). As the appellate court further noted in Dinwiddie, "this list is not exhaustive." Id.

20. The trial court in Dinwiddie specifically considered the victims' knowledge of national statistics of violence at reproductive health centers, publicized violence against physicians providing abortions, anonymous threats received by the victims, and other anonymous acts of destruction or violence directed at the victims' and the clinic. Dinwiddie, 885 F. Supp. at 1291 (emphasis added). In McMillan, the court similarly took into account the victims' knowledge of clinic violence nationwide, and also considered their knowledge of the defendant's well-publicized endorsement of the use of force and violence against abortion providers. 1996 WL 673460 at *10.

21. Thus, in deciding whether Smith's statements were reasonably construed as threats by the intended victims -- Dr. Applegate and Antoniotti -- the Court must factor in all of the circumstances, including: 1) Smith's words, conduct and demeanor during the incidents; 2) Dr. and Mrs. Applegate's and Antoniotti's prior encounters with Smith; 3) their knowledge of his conduct toward other reproductive health care providers; 4) the anonymous threats and acts of violence directed at them and their clinics and families by abortion opponents; and 5) their knowledge of violence and threats against reproductive health care providers across the country. See Dinwiddie, 885 F. Supp. at 1291; McMillan, 946 F. Supp. at 1268.

22.   Under the Access Act, an obstruction is defined as "rendering impassable ingress to or egress from a facility that provides reproductive health services . . . or rendering passage to or from such a facility . . . <u>unreasonably difficult or hazardous</u>.  18 U.S.C. § 248(e)(4) (emphasis added).

23.   A showing that the defendant has rendered access or egress impossible is not necessary to establish a violation of the Act; rather, the defendant has obstructed access or egress if he renders passage unreasonably difficult or hazardous.  <u>See</u> <u>United States</u> v. <u>Lindgren</u>, 883 F. Supp. 1321, 1328 (D.N.D. 1995) (court found access rendered unreasonably difficult where staff and patients had to climb over a car or squeeze between the car and a fence or bushes to get into clinic); <u>Dinwiddie</u>, 885 F. Supp. at 1292 (defendant's following closely and yelling at client leaving clinic constituted physical obstruction, interference and intimidation); <u>United States</u> v. <u>White</u>, 893 F. Supp. 1423, 1431 (C.D. Cal. 1995) (defendants' boxing doctor's car between their two vehicles while driving to clinic supported finding that defendants had violated Access Act).

24.   An attempt is a substantial step towards the commission of an illegal act, willfully taken.  <u>United States</u> v. <u>August</u>, 835 F.2d 76, 78 (5th Cir. 1987).

25. Smith's conduct toward Drs. Ruddock and Applegate and Antoniotti both before and after the five alleged Access Act violations are properly considered by the Court as evidence of Smith's motive and intent to intimidate, injure or interfere with Dr. Applegate, Antoniotti and Mrs. Applegate. See Fed. R. Evid. 404(b) (evidence of other crimes, wrongs, or acts may be admitted to prove "motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident."); United States v. Nemeth, 430 F.2d 704, 705 (6th Cir. 1970); United States v. Knost, No. 86-1210, 1986 WL 18495 (6th Cir. Dec. 16, 1986), cert. denied, 480 U.S. 950 (1987).

26. Both intent and motive are relevant to establishing Access Act violations. See 18 U.S.C. § 248(a)(1) (Act prohibits conduct that intentionally injures, intimidates or interferes with or attempts to do so); Senate Report at 26 (legislative history characterizes requirement that violations be committed "in order to intimidate such person or any other person or any class of persons from[] obtaining or providing reproductive health services" as "motive" element.)

27. This Circuit has interpreted Rule 404(b) to permit the introduction of evidence of prior criminal activity to "show a consistent pattern of conduct," provided that the other conduct is similar in nature and close in time. See Nemeth, 430 F.2d at 705; United States v. Myers, 102 F.3d, 227, 233-34 (6th Cir. 1996) (drug deals for two years before and nine months after alleged offense allowed in under Rule 404(b).

- 38 -

28. The testimony of Drs. Ruddock and Applegate and Antoniotti regarding Smith's prior bad conduct is clear evidence of Smith's "consistent pattern of [threatening] conduct," and proves that he intended to intimidate and interfere with these individuals and Mrs. Applegate through the threats and obstruction alleged in this case.

29. At trial, the United States established that, as part of this "consistent pattern," Smith uses the same modus operandi, (United States v. Myers, 550 F.2d 1036, 1045 (5th Cir. 1977), cert. denied, 439 U.S. 847 (1978)), namely: 1) high speed chases with his truck; 2) trying to force the doctors' cars off the road; 3) verbally threatening the victims; 4) targeting Youngstown reproductive health care providers and their families; and 5) acting only when few or no witnesses were around.

30. Smith's prior and subsequent bad conduct are sufficiently similar to the five alleged violations and to each other as to be of a "signature quality." United States v. Gutierrez, 696 F.2d at 755 ("If the crimes share elements that possess 'signature quality,' evidence of the 'other crime' may be admitted."); see also Myers, 550 F.2d at 1045 (court focused on similarities of the same woman driving the get-away car and using her children as cover in both robberies).

31. The probative value of Drs. Ruddock's and Applegate's and Antoniotti's testimony about Smith's other bad acts outweighs the potential prejudice. See United States v. Cowart, 90 F.3d 154, 157 (6th Cir. 1996) (trial court usually required to make "an explicit finding on the probative value versus the prejudicial effect of the evidence"). Their testimony is critical to providing a complete picture of the consistent

39

pattern of Smith's threatening and violent conduct, which he has directed against Youngstown abortion providers for the past five years. These facts show Smith's intent with respect to the alleged Access Act violations. Given that this case was tried before the Court, the potential for prejudice is little. Cf. Myers, 1996 WL 709214 at *5 (Rule 404(b) evidence properly admitted in jury trial where limiting instruction given); Nemeth, 430 F.2d at 705; see Spencer v. Texas, 385 U.S. 554, 560-61 (1967) (recognizing longstanding practice of admitting prior criminal record with appropriate limiting instruction).

32. "The quantum of 404(b) evidence itself does not tip scales to prejudice." Myers, 1996 WL 709214 at *7 (rejecting appellant's claim that quantity of other crimes evidence admitted was prejudicial).

33. The testimony of Drs. Ruddock and Applegate and Antoniotti about Smith's prior bad conduct is also highly probative of the reasonableness of their perception that Smith had threatened them. See, e.g., Dinwiddie, 76 F.3d at 925 (in determining whether threat had occurred, court considered whether defendant "had made similar statements to or engaged in similar conduct with respect to the victim in the past and whether the victim had reason to believe the maker had a propensity to engage in violence.")

40

34. Evidence of Smith's bad acts after the alleged Access Act violations is also probative of the need for and scope of injunctive relief. Madsen v. Women's Health Center, Inc., __ U.S. __, 114 S.Ct. 2516, 2524 n. 3 (1994) (quoting United States v. W.T. Grant Co., 345 U.S. 629, 633 (1953)) ("[A]n injunction issues only if there is a showing that the defendant has violated, or imminently will violate, some provision of statutory or common law, and there is a 'cognizable danger of recurrent violation.'"); United States v. Laerdal Manufacturing Corp., 73 F.3d 852, 857 (9th Cir. 1995) ("past illegal conduct gives rise to an inference that future violations may occur"); SEC v. Holschuh, 694 F.2d 130, 144 (7th Cir. 1982) ("In predicting the likelihood of future violations, a court must assess the totality of the circumstances surrounding the defendant and his violation . . . ."); SEC v. Washington County Utility, 676 F.2d 218, 227 (6th Cir. 1982) (the frequency and magnitude of past violations "serves as a basis for an inference that future violations may occur.").

35. Issuance of an injunction is particularly appropriate "in the face of [defendant's] own inability to recognize his transgressions of the Act." United States v. Bob Lawrence Reality, Inc., 474 F.2d 115 (5th Cir.), cert. denied, 414 U.S. 826 (1973); Laerdal Manufacturing Corp., 73 F.3d at 856.

36. Smith's violations of the Access Act and prior court orders -- which include demonstrating at Dr. Applegate's home on

- 41 -

November 13, 1994, threatening the doctor outside the Center on
August 26, 1996, causing a near collision with Dr. Applegate on
Interstate 680 on December 14, 1996, and demonstrating at the
Center on January 19, 1997 -- as well as his statements on local
television after his June 1994 arrest and during the January 19,
1997 demonstration clearly establish that there is a "cognizable
danger of recurrent violation."

37.  Smith violated the Access Act on five different dates
-- obstructing and threatening Mrs. Applegate on June 7, 1994,
threatening Dr. Applegate on June 16 and November 13, 1994,
threatening and using force against Dr. Applegate on June 18,
1994, and threatening Roberta Antoniotti on September 29, 1994.

38.  June 7, 1994.  As the evidence at trial established, on
June 7, 1994, a group of protesters made it "unreasonably
difficult and hazardous" for Mrs. Applegate to leave her car and
enter her husband's office, then located in a building at
Passavant Hospital.  See, e.g., Lindgren, 883 F. Supp. at 1328
(access rendered unreasonably difficult where staff and patients
had to climb over a car or squeeze between the car and a fence or
bushes to get into clinic).  These protesters created an
intimidating and menacing environment near Mrs. Applegate's car
when she arrived in the parking lot that afternoon.  As Mrs.
Applegate testified, Smith, upon seeing Mrs. Applegate's car
began pointing and shouting, "There she is!  That's his wife!"

He then led a group of protesters up to and near Mrs. Applegate's car, with some of the demonstrators coming as close as a foot or two from her driver's side door. Smith, in particular, exploited and intensified this already "tense" environment -- a description provided by the television reporter, Martin -- by stopping at Mrs. Applegate's door, bending down so that he was at eye level with Mrs. Applegate and peering at her over his sign, which most likely read, "Applegate is a babykiller and a deadbeat dad." Given the history that Smith and the Applegates had at that time, as well as the threatening and violent activities that had been directed at the Applegates by anonymous "pro-life friends," Mrs. Appleglate, reasonably perceived Smith's actions as threatening and, rightfully, was too afraid to leave her car. As her husband testified, in all the years he's known her, he had never seen her so terrified. Indeed, even Martin felt intimidated by the blue vehicle circling him and Mrs. Applegate -- which she also saw -- and which was being driven by a female protester who was photographing them. Furthermore, at various times, Mrs. Applegate was physically prevented from getting out of her car by the presence of demonstrators within a foot of her door, and at a minimum, she would have to get out "amongst" the demonstrators in order to get into the building. In light of all of these circumstances, Mrs. Applegate's entering the building would have been "unreasonably difficult or hazardous." Mrs. Applegate was only able to get into the building because Martin was there to escort her. Furthermore, in light of all of the

43

circumstances, Smith's conduct constituted a threat to Mrs. Applegate.

39. <u>June 16, 1994</u>. As the evidence at trial established, on June 16, 1994, Smith threatened Dr. Applegate by pantomiming the act of shooting the doctor. Given Dr. Applegate's numerous encounters with Smith prior to that date -- which included Smith following the doctor from the Center several times, a confrontation in the parking lot behind the Center in which Smith repeatedly yelled to the doctor, "Babykiller, babykiller! Come here, babykiller!", and Smith demonstrating in a loud and offensive manner at the Applegates' home -- as well as the stream of anonymous threatening and violent activities directed at the Applegates that began when the doctor started working at the Center, Dr. Applegate reasonably interpreted Smith's conduct as a "serious expression of an intention to inflict bodily harm."

40. <u>June 18, 1994</u>. As the evidence at trial established, on June 18, 1994, Smith chased Dr. Applegate as he was leaving the Center and tried to force the doctor's car into oncoming traffic with his truck. In itself, this conduct constituted a use of force, namely, Smith's driving his truck at Dr. Applegate's car. In addition, Smith statements, to the effect of, "Babykiller! Applegate, you're dead. Where's your wife? I'm going to kill you," as well as the act of driving a truck toward Dr. Applegate's car, were reasonably interpreted by Dr. Applegate as "serious expressions of an intention to inflict bodily harm."

41. <u>November 13, 1994</u>. As the evidence at trial established, on November 13, 1994, Smith threatened Dr. Applegate by telling his stepdaughter, Jaime Groetsch, that her stepfather was "dead." Given Dr. Applegate's threatening and violent encounters with Smith prior to that date -- especially Smith's June 18th attempt to run the doctor off the road -- Dr. Applegate reasonably interpreted Smith's statement to his stepdaughter as a "serious expression of an intention to inflict bodily harm."

42. <u>September 29, 1994</u>. As the evidence at trial established, on September 29, 1994, Smith threatened Roberta Antoniotti by telling her in a face-to-face confrontation that he was going to "get her." Given Antoniotti's previous encounters with Smith -- which included Smith making the same threat to her the year before -- as well as anonymous threats she and the clinic had received, her knowledge of acts of violence regularly being committed against Planned Parenthood clinics and staff, and her knowledge of Smith's threatening conduct toward Drs. Ruddock and Applegate, Antoniotti reasonably interpreted Smith's conduct as a "serious expression of an intention to inflict bodily harm."

43. As evidenced by Smith's own statements, the "consistent pattern of Smith's conduct" toward Mahoning County reproductive health service providers, including Drs. Ruddock and Applegate, Mrs. Applegate and Antoniotti, and the alleged conduct itself, each of these acts of threats, use of force and obstruction was committed with the intent to injure, intimidate, or interfere with Dr. Applegate, Mrs. Applegate and Antoniotti because they

45

were seeking to provide, and their clients were seeking to
obtain, reproductive health services.

44.    In addition, each of Smith's acts of threats, use of
force and obstruction constituted an attempt -- or a "substantial
step towards the commission" of the acts -- to intimidate, injure
and interfere with Dr. Applegate, Mrs. Applegate and Antoniotti.

45.    The issuance of a permanent injunction is an
appropriate remedy for any of Smith's violations of the Access
Act.  See 18 U.S.C. § 248(c)(2)(B) (Access Act expressly
authorizes Court to issue "temporary, preliminary or permanent
injunctive relief"); McMillan, 1996 WL 673460 at *12 (citing
Madsen as recognizing importance of injunctive relief in clinic
case); Madsen, 114 S.Ct. at 2524 (injunctions are "remedies
imposed for violations (or threatened violations) of a
legislative or judicial decree.").

46.    In Madsen, the Supreme Court recognized that the
government's interest in "protecting a woman's freedom to seek
lawful medical or counseling services in connection with her
pregnancy," "ensuring the public safety and order," and
"promoting the free flow of traffic on public streets and
sidewalks" were "sufficient to justify an appropriately tailored
injunction."  114 S.Ct. at 2525.

47.    The scope of any permanent injunction issued in this
case may exceed the prohibitions of the Access Act.  Such
remedies, which are designed to prevent future violations of the

46

statute, are commonplace in Access Act actions, and do not unnecessarily burden a defendant's First Amendment rights. See, e.g., McMillan, 1996 WL 673460 at *15 (approving 25-foot buffer zone as "narrowly tailored to the evidence presented" in Access Act case involving threats), United States v. Roach, 947 F. Supp. 872, 878 (E.D. Pa. 1996); (ordering defendants to stay off clinic property unless obtaining services); Terry v. Reno, 101 F.3d 1412, 1422-23 (D.C. Cir., Dec. 10, 1996) (discussing various cases allowing buffer zones as a remedy).

48. The standard for determining the proper scope of injunctive relief, as articulated in Madsen, is "whether the challenged provisions of the injunction burden no more speech than necessary to serve a significant government interest." 114 S.Ct. at 2525.

49. In light of the "significant government interests" to be served in this case -- i.e., stopping Smith's threatening and violent conduct, preventing Smith from carrying out any of his threats, and protecting the constitutional right of women to seek reproductive health services free from unlawful interference -- the permanent injunction sought by the United States "burdens no more speech than necessary" and does not violate the First Amendment. Madsen, 114 S.Ct. at 2525. The scope of the relief sought in this case is justified by the seriousness of the harm posed by the defendant's threatening and violent conduct and his

blatant disregard for judicial authority. Indeed, Smith has already nearly succeeded in causing Dr. Applegate serious physical injury when he tried to force the doctor into oncoming traffic on June 18, 1994, to say nothing of the December 14, 1996 incident where Dr. Applegate nearly collided with Smith when Smith cut in front of the doctor's car with his truck and slammed on his brakes.

50. In particular, the provision barring Smith from demonstrating outside the Center is a necessary and appropriate means of preventing Smith from continuing to follow and threaten Dr. Applegate as he leaves the Center. As established at trial, since the early 1990s, Smith has engaged in a pattern of following, chasing and attempting to harm the doctors who work at the Center, first Dr. Ruddock and then Dr. Applegate. Smith has only been able to engage in this conduct because he knows where to find the doctors, namely, at the Center on procedure days. Indeed, all of the incidents where Smith has chased the doctors started with Smith following the doctors out of the Center. Although the proposed Permanent Injunction would directly prohibit Smith from following Dr. Applegate, there is no reason to believe that Smith will obey this provision. In fact, the evidence presented at trial strongly indicates the contrary. Over the past six months, Smith has violated this Court's orders three times: 1) on July 27, 1996, when Smith threatened the doctor outside the Center; 2) on December 14, 1996, when Smith followed the doctor onto I-680, pulled in front of the doctor's

car, and slammed on his brakes, nearly causing a collision; and
3) on January 19, 1997, when Smith demonstrated outside the
Center in clear violation of this Court's order to stay away from
the clinic. Nothing in the record suggests that Smith will now
obey an injunction issued by the Court.

51. In exercising its traditional equitable power to "base
protection against future coercion on an inference of the
continuing threat of past misconduct," Milk Wagon Drivers Union
v. Meadowmoor Dairies, Inc., 312 U.S. 287, 295 (1941), the Court
may conclude that Smith's prior conduct demonstrates that he will
likely disobey any prohibition on following or threatening Dr.
Applegate. In a case such as this, where mere prohibitions will
not suffice to prevent the unlawful conduct, the Court may
"fashion appropriate restraints on the [defendant's] future
activities . . . to avoid a recurrence of the violation."
National Soc'y of Professional Engineers v. United States, 435
U.S. 679, 697 (1978). Rather than letting Smith follow and
threaten Dr. Applegate and punishing him after the fact, this
Court may conclude that it is necessary to stop the defendant
before he can achieve his goal. The proposed ban on Smith
demonstrating at the Center is necessary to ensure compliance
with the Permanent Injunction's core prohibitions on threats and
uses of force. As in Madsen, this Court has previously issued a
more narrowly-drawn injunction that did not succeed in preventing
unlawful conduct from occurring. Madsen, 512 U.S. at 769-770. A more restrictive injunction
is warranted.

52. The fact that the injunction sought by the United States is directed solely against Smith (and his agents or employees) does not violate the principle of content neutrality or the First Amendment. See Madsen, 512 U.S. at 759-60. (explicitly rejecting argument that injunction restricting only conduct of anti-abortion protesters is, by virtue of that fact, content-based).

III. CONCLUSION

Based upon the foregoing facts and law, it is the opinion of this Court that a Permanent Injunction should issue, as follows:

IT IS HEREBY ORDERED that:

Defendant Alan Maurice Smith and his agents, servants, and employees are enjoined from committing any of the following acts and from aiding, abetting, directing, or inciting others to commit any of the following acts:

1. Establishing any contact with Dr. Gerald Applegate, Karen Applegate, Roberta Antoniotti or any member of their respective families, including, but not limited to, communication by mail or telephone, approaching, following by any means, and gesturing or talking directly to them;

2. Being within visual or audible range of Dr. Applegate, Mrs. Applegate, Ms. Antoniotti or any member of their respective families, including, but not limited to, being in proximity to any of these individuals while in a motor vehicle.

3. Being within visual or audible range of the homes of Dr. and Mrs. Applegate and Ms. Antoniotti.

4. Being within visual or audible range of the Mahoning Women's Center.

5. Being within 100 feet of Planned Parenthood of Mahoning Valley, Dr. Applegate's private office in Wexford, Pennsylvania or any other clinic where Dr. Applegate works.

6. Violating the Freedom of Access to Clinic Entrances Act, 18 U.S.C. § 248 (1994), anywhere.

Willful disobedience of this Permanent Injunction or resistance to this Court's lawful order may subject a person covered by this Permanent Injunction to criminal or civil prosecution for contempt of Court.

The law enforcement officers empowered to enforce this Permanent Injunction may give persons subject to this Permanent Injunction notice of its pertinent contents by providing them with a copy of the Order. If a person or his or her attorney has received a copy of this Permanent Injunction, no additional notice is required.

IT IS SO ORDERED.

/s/ SOLOMON OLIVER, JR.
UNITED STATES DISTRICT JUDGE

March 31, 2009

51